El Juez Asociado Señor Feliberti Cintrón
emitió la opinión del Tribunal.
El hurto de materiales acaecido en una ferretería, pro-piedad de Maderas Tratadas, Inc. (Maderas Tratadas), dio origen a una trilogía de recursos de los cuales únicamente nos toca atender las controversias planteadas en el recurso CC-2006-0228 y parte de los errores aducidos en el recurso CC-2006-0266.([1]) En el primero de éstos se suscitaron con-troversias relacionadas al contrato de seguro otorgado en- *890 tre Universal Insurance Company (Universal) y CBI Security Services, Inc. (CBI), compañía de seguridad. Como parte de esas interrogantes, nos toca resolver si Universal actuó correctamente al denegar una cubierta fundamen-tada en que los hechos imputados a CBI en calidad de ase-gurado constituyen incumplimiento de contrato y no una ocurrencia (“occurrence”), según el término aparece defi-nido en la póliza correspondiente. De determinar que, en efecto, existe la cubierta, procede entonces precisar si apli-can ciertas exclusiones, según consignadas en la póliza. Igualmente, nos corresponde dirimir si se configuran los requisitos necesarios para obligar a Universal, a pesar de haber emitido una póliza sombrilla, a asumir la posición de asegurador primario conforme a la teoría de descenso de nivel o drop down.
En lo concerniente al CC-2006-0266, primeramente exa-minaremos la responsabilidad correspondiente a la Asocia-ción de Garantías de Seguros Misceláneos (Asociación) a base de las reclamaciones presentadas por Maderas Tratadas. Luego evaluaremos la reducción en la cuantía de los honorarios concedidos por el foro primario atribuibles a los gastos incurridos por Maderas Tratadas en uno de sus peritos.
Luego de examinar los planteamientos esgrimidos por Universal, conjuntamente con los documentos que obran en autos y a la luz del derecho aplicable, procedemos a confirmar la determinación recurrida en todos sus aspec-tos, excepto en lo atinente a la aplicación de la doctrina del descenso de nivel (“drop down”). Veamos.
I
Maderas Tratadas es una corporación dedicada a la fe-rretería con parte de sus instalaciones ubicadas en Toa Baja, Puerto Rico. En septiembre de 1989, Maderas Trata-das contrató a CBI para prestar servicios de vigilancia con *891 guardias armados las veinticuatro horas del día, los siete días de la semana, en la propiedad indicada.
Durante el verano de 1992, personal de Maderas Trata-das se percató de una serie de hurtos y escalamientos en el edificio donde operaba la ferretería. Específicamente, alre-dedor del 22 de junio de 1992 y durante el fin de semana del 26 de junio de 1992, se encontraron ventanas rotas y forzadas, así como escalamientos en el área de la ferretería.
La gerencia de Maderas Tratadas informó los incidentes al Sr. Fernando Matos, gerente de operaciones de CBI, así como al Cuerpo de Investigaciones Criminales de la Policía de Puerto Rico (CIC). La investigación policiaca culminó con el arresto y la convicción del Sr. José Alberto Concep-ción García, exempleado de Maderas Tratadas, y el Sr. Juan González Colón (guardia González) quien, para la época de los sucesos, laboraba como guardia de seguridad para CBI. Los acusados admitieron haber perpetrado y ha-ber consentido a que terceras personas llevaran a cabo múltiples sustracciones de mercancía propiedad de Made-ras Tratadas.([2])
Una auditoría externa de los negocios de la empresa, correspondiente al año fiscal comprendido entre 1 de agosto de 1991 a 31 de julio de 1992 y concluida en diciem-bre de 1992, reflejó una falta en el inventario, atribuible a mercancía robada, de dos millones cuatrocientos mil dos-cientos noventa y ocho dólares ($2,400,298).
Al momento de los hechos, Maderas Tratadas contaba con una póliza expedida a su favor por Sun Alliance Insurance Company (Sun Alliance) que cubría específicamente riesgo de robo hasta un total de ocho millones noventa y ocho mil cuatrocientos dólares ($8,098,400). No obstante, Sun Alliance denegó la cubierta.
*892 CBI por su parte poseía varias pólizas de seguro para las fechas pertinentes. Por un lado, tenía expedida a su favor una póliza primaria con una partida por responsabi-lidad pública expedida por Insurance Company of Florida (ICF), póliza #28-000905 con una cubierta de un millón de dólares ($1,000,000). La aseguradora fue declarada insol-vente y sujeta al proceso de liquidación de sus activos me-diante una orden emitida por el Tribunal de Primera Ins-tancia, Sala Superior de San Juan, el 27 de enero de 1993. En virtud de la Ley 72-1991, según enmendada, 26 L.P.R.A. sees. 3801-3819 (Ley 72), la Asociación compare-ció en el litigio como entidad a cargo de las reclamaciones instadas contra ICF.
De otra parte, CBI tenía también dos pólizas en exceso tipo sombrilla con Universal. Estas son: (1) póliza Núm. UMB-102, vigente de 20 de noviembre de 1990 a 20 de noviembre de 1991, con un límite combinado de un millón de dólares ($1,000,000) y (2) póliza Núm. UMB-131, vi-gente de 20 de noviembre de 1991 a 20 de noviembre de 1992, con un límite anual por agregado ascendente a un millón de dólares ($1,000,000).
Maderas Tratadas y el Sr. Luis J. Fernández (señor Fer-nández) instaron una demanda contra Sun Alliance, para alegar incumplimiento de contrato y daños y perjuicios por la denegatoria de cubierta de esta (caso Civil Núm. D AC 1993-0221). Igualmente, el 14 de abril de 1993 iniciaron una acción contra CBI y sus aseguradoras sobre incumpli-miento de contrato y daños y perjuicios (caso Civil Núm. D AC 1993-0222).
Luego de varios trámites procesales, se dieron por en-mendadas las alegaciones de la demanda (D AC 1993-0222) para identificar las entidades siguientes como asegurado-ras de CBI: (1) ICF o la Asociación y (2) Universal como aseguradora en exceso de los límites de las pólizas de ICF o la Asociación.
*893 Oportunamente, los dos casos iniciados por Maderas Tratadas y el señor Fernández fueron consolidados a nivel de instancia y luego de los trámites procesales pertinentes se celebró el juicio en su fondo. El Tribunal de Primera Instancia emitió su sentencia el 13 de febrero de 2003 y declaró “con lugar” las reclamaciones vertidas en ambas demandas y condenando a CBI, Sun Alliance, la Asociación y Universal a pagarle solidariamente a Maderas Tratadas las sumas siguientes: (1) dos millones cuatrocientos mil doscientos noventa y ocho dólares ($2,400,298) por la pér-dida correspondiente al hurto de su inventario, (2) tres mi-llones setecientos cincuenta y ocho mil ciento siete dólares ($3,758,107) por pérdidas en ventas, (3) quinientos veinte mil dólares ($520,000) por la pérdida de cánones de arren-damiento en su local en Arecibo, (4) sesenta y seis mil se-tecientos cincuenta y seis dólares ($66,756) por la pérdida producida al tener que vender por debajo de su valor las propiedades de Arecibo y Carolina, y (5) trescientos setenta y cinco mil con sesenta dólares ($375,060) por la pérdida de plusvalía o “goodwill” de la entidad.
Además, los condenó a pagarle solidariamente al señor Fernández la cantidad de un millón setecientos veinticua-tro mil dólares ($1,724,000) por los daños sufridos al tener que despojarse de sus activos para afrontar la crisis econó-mica de la empresa como consecuencia de los hechos que dieron base a las reclamaciones vertidas en sus demandas.
El Tribunal de Primera Instancia entendió que las ase-guradoras habían incurrido en mala fe al denegar la cu-bierta bajo sus respectivas pólizas, por lo que respondían solidariamente por los daños derivados de esa conducta, independientemente de los límites provistos en ellas.
Por último, el Tribunal de Primera Instancia entendió que CBI y las aseguradoras habían sido temerarias al no acceder a los reclamos de Maderas Tratadas y el señor Fer-nández, por lo que se les condenó al pago de intereses *894 desde la fecha de radicación de la demanda, así como el pago solidario de cincuenta mil dólares ($50,000) por hono-rarios de abogado, además de las costas y los gastos del litigio.
En lo atinente a la responsabilidad de CBI, el Tribunal de Primera Instancia determinó que esta fue negligente al no supervisar a sus guardias de seguridad y al no ejercer el debido cuidado al escogerlos.
Asimismo dictaminó que, al ICF declararse insolvente, correspondía a la Asociación responder hasta la suma es-tatutaria de ciento cincuenta mil dólares ($150,000) por cada una de las diecisiete reclamaciones sometidas por Maderas Tratadas, hasta llegar al límite de la póliza emi-tida por ICF, es decir, un millón de dólares ($1,000,000). De otra parte, aplicando el principio de descenso de nivel (“drop down”), decretó que correspondía a Universal asu-mir la posición de ICF, asegurador primario, al haber sido éste declarado insolvente.
Posteriormente, mediante Resolución de 1 de mayo de 2003, el Tribunal de Primera Instancia aprobó en su tota-lidad el “Memorando de Costas” sometido por Maderas Tratadas.
Inconformes, CBI, Sun Alliance, la Asociación y Universal recurrieron por separado ante el Tribunal de Apelacio-nes para solicitar la revocación de la sentencia del Tribunal de Primera Instancia, así como la revisión de la resolución atinente a las costas del litigio. El Tribunal de Apelaciones dispuso de las cuatro apelaciones conjunta-mente mediante sentencia emitida el 30 de junio de 2005. Posteriormente, en respuesta a la solicitud de reconsidera-ción sometida por Maderas Tratadas y el señor Fernández, el foro apelativo intermedio dictó una sentencia enmen-dada el 15 de febrero de 2006 a los únicos fines de recon-siderar su determinación previa atinente a la pérdida de plusvalía del negocio de Maderas Tratadas y ciertas costas previamente concedidas en el pleito.
*895 Entre sus determinaciones, el tribunal apelativo inter-medio coincidió con el dictamen del foro primario a los efec-tos de que: (1) CBI fue negligente al no ejercer el debido cuidado al contratar sus guardias de seguridad y al no su-pervisarlos adecuadamente; (2) las pólizas de seguro expe-didas por Sun Alliance, la Asociación y Universal, respec-tivamente, proveían cubierta por los daños reclamados, a la vez que procedía la determinación de temeridad.
No obstante, el Tribunal de Apelaciones decretó que la Asociación únicamente respondía hasta el límite total de ciento cincuenta mil dólares ($150,000) y circunscribió el dictamen atinente a la mala fe por denegatoria de cubierta de Sun Alliance. Dispuso, además, que la única póliza vi-gente emitida por Universal para efectos del litigio era la Núm. UMB-131, con un límite de cubierta de un millón de dólares ($1,000,000), sujeta a la teoría de descenso de nivel (“drop down”).
Como resultado del dictamen del Tribunal de Apelacio-nes, según indicáramos, surgieron tres recursos separados ante este Foro de los cuales solo quedan pendientes los casos consolidados de epígrafe. Mediante la resolución de 12 de mayo de 2006, expedimos el auto de certiorari solici-tado en el recurso CC-2006-0228 y el 19 de marzo de 2006 expedimos el auto en el recurso CC-2006-0266.
Comenzamos por resolver las controversias correspon-dientes al recurso CC-2006-0228.
II

CC-2006-0228

Inconforme con la Sentencia emitida por el Tribunal de Apelaciones, Universal acudió ante nos consignando los errores siguientes:
1. ERRÓ EL TRIBUNAL DE APELACIONES AL DETERMI-NAR QUE LA PÓLIZA SOBRE RESPONSABILIDAD PÚ-BLICA EMITIDA POR UNIVERSAL PROVEÍA CUBIERTA *896 PARA LOS HECHOS DEL PRESENTE CASO A PESAR DE QUE LOS MISMOS TRATAN SOBRE UN INCUMPLI-MIENTO DE CONTRATO POR PARTE DEL ASEGURADO Y NO DE UNA OCURRENCIA (“OCCURRENCE”) CUBIERTA POR LA MISMA.
2. ERRÓ EL TRIBUNAL DE APELACIONES AL DETERMI-NAR QUE EN VIRTUD DE LA PÓLIZA SOMBRILLA EMI-TIDA POR UNIVERSAL ÉSTA ESTABA EN LA OBLIGA-CIÓN DE ASUMIR LA POSICIÓN DEL ASEGURADOR PRIMARIO INSOLVENTE DE CONFORMIDAD CON LA TEORÍA DE DESCENSO DE NIVEL (“DROP DOWN”).
3. ERRÓ EL TRIBUNAL DE APELACIONES AL DETERMI-NAR QUE EN EL PRESENTE CASO UNIVERSAL INCU-RRIÓ EN TEMERIDAD. Certiorari, pág. 7.
Alega Universal que los hechos presentes en este caso no dan margen a cubierta o, en la alternativa, están suje-tos a exclusión, conforme a lo provisto en los términos y las condiciones de la póliza emitida a favor de CBI. Universal sostiene que la reclamación iniciada por Maderas Tratadas se halla fundamentada estrictamente en una violación de las obligaciones contractuales asumidas por CBI, asunto que está expresamente excluido del seguro en cuestión por no constituir una ocurrencia (“occurrence”), según aparece definido en la póliza.
Con el propósito de dirimir el error que antecede según esbozado por Universal, comenzamos por examinar el marco doctrinal atinente al campo de seguros, con especial énfasis al término ocurrencia, según incorporado a la pó-liza sombrilla emitida por Universal.
III

El contrato de seguro

Reiteradamente hemos destacado que, en nuestra sociedad, el negocio de seguros está revestido de un alto interés público debido a su importancia, complejidad y efecto en la economía y la sociedad, razón por la cual ha sido ampliamente reglamentado por el Estado. S.L.G. Or *897 tiz-Alvarado v. Great American, 182 D.P.R. 48 (2011); Jiménez López et al. v. SIMED, 180 D.P.R. 1 (2010); S.L.G. Francis-Acevedo v. SIMED, 176 D.P.R. 372 (2009).
El seguro juega un papel económico crucial, tanto a nivel individual como en el ámbito comercial, ya que per-mite igualmente a las personas, como a los negocios, proteger sus recursos al transferir el impacto monetario de ciertos riesgos a cambio del pago de una prima. ([3]) L. Benitez de Lugo y Reymundo, El riesgo jurídico: los seguros de gastos de procesos y de litigios, Madrid, [s. Ed.], 1961, pág. 17.
La póliza configura el documento escrito donde se plas-man los términos que rigen el contrato de seguro. Este se ha descrito como aquel pacto que suscriben las partes a través del cual “el asegurador, se compromete, a cambio del pago de una prima, a indemnizar a un tercero, por lo general al asegurado o un reclamante, por una pérdida con-tingente al ocurrir un evento futuro incierto previsto”. R. Cruz, Derecho de Seguros, San Juan, Pubs. J.T.S., 1999, pág. 387. Similar a todo contrato, sus términos constituyen la ley entre las partes. S.L.G. Ortiz-Alvarado v. Great American, supra; Jiménez López et al. v. SIMED, supra; S.L.G. Francis-Acevedo v. SIMED, supra.
El propio Código de Seguros pauta la norma que ha de regir en el descargo de nuestra función interpretativa de las cláusulas contenidas en una póliza de seguro. A esos efectos, “[t]odo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado”. Art. 11.250 *898 del Código de Seguros, 26 L.P.R.A. see. 1125. Véase, además, Jiménez López et al. v. SIMED, supra; Echandi Otero v. Stewart Title, 174 D.P.R. 355 (2008); Monteagudo Pérez v. E.L.A., 172 D.P.R. 12 (2007).
Por lo tanto, los principios generales de hermenéutica atinentes a los contratos, según esbozados en los Arts. 1233 a 1241 del Código Civil, 31 L.P.R.A. sees. 3471-3479, se utilizarán únicamente de manera supletoria. Jiménez López et al. v. SIMED, supra; Echandi Otero v. Stewart Title, supra; Molina v. Plaza Acuática, 166 D.P.R. 260 (2005).
En aquellos casos en los que surjan dudas en torno a la interpretación de los términos de una póliza, éstas deben resolverse de manera que se cumpla con su designio intrín-seco, es decir, proveer protección al asegurado. S.L.G. Francis-Acevedo v. SIMED, supra; Quiñones López v. Manzano Pozas, 141 D.P.R. 139 (1996).
Como parte del proceso de examinar los términos consignados en el acuerdo, los tribunales vienen obligados a considerar los vocablos utilizados a base de su acepción cotidiana como lo haría un ciudadano de inteligencia promedio interesado en obtener una póliza de seguro. Quiñones López v. Manzano Pozas, supra; S.L.G. Ortiz-Alvarado v. Great American, supra; S.L.G. Francis-Acevedo v. SIMED, supra.
Cónsono con lo anterior y similar al proceso de interpre-tación de las leyes, se examinarán las palabras contenidas en la póliza “en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, sino al uso general y popular de las voces”. Art. 15 del Código Civil, 31 L.P.R.A. sec. 15 (1993). Véanse: S.L.G. Ortiz-Alvarado v. Great American, supra; Jiménez López et al. v. SIMED, supra; Molina v. Plaza Acuática, supra; Quiñones López v. Manzano Pozas, supra.
Como regla general, las disposiciones de un contrato de seguro deben de ser interpretadas liberalmente a *899 favor del asegurado por constituir éste un contrato de adhesión.([4]) S.L.G. Ortiz-Alvarado v. Great American, supra; S.L.G. Francis-Acevedo v. SIMED, supra; Echandi Otero v. Stewart Title, supra; Monteagudo Pérez v. E.L.A., supra; Quiñones López v. Manzano Pozas, supra.
No obstante, este principio de hermenéutica no aplicará cuando las cláusulas en cuestión resulten claras y libres de ambigüedad. En tales casos se hará valer la clara voluntad de las partes y el asegurado vendrá obligado por los térmi-nos manifestados allí. S.L.G. Ortiz-Alvarado v. Great American, supra; Jiménez López et al. v. SIMED, supra; S.L.G. Francis-Acevedo v. SIMED, supra.
Los términos de un contrato se reputan claros “cuando por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su com-prensión razonamientos o demostraciones susceptibles de impugnación”. (Escolio y comillas omitidos). S.L.G. Francis-Acevedo v. SIMED, supra, pág. 387.
De otra parte, cabe notar que las cláusulas de ex-clusión, que operan para limitar la cubierta provista por la aseguradora y, de este modo, no responder por determinados eventos, riesgos o peligros, son generalmente desfavorecidas. Así pues, éstas serán interpretadas restrictivamente en contra del asegurador para, de este modo, cumplir con el propósito intrínseco de la póliza, es decir, dar mayor protección al asegurado. Jiménez López et al. v. SIMED, supra; S.L.G. Francis-Acevedo v. SIMED, supra; Echandi Otero v. Stewart Title, supra; Monteagudo Pérez v. E.L.A., supra.
No obstante, si las cláusulas de exclusión son claras y aplican a determinada situación, la aseguradora no será *900 responsabilizada por aquellos riesgos expresamente excluidos. Jiménez López et al. v. SIMED, supra; Echandi Otero v. Stewart Title, supra; Molina v. Plaza Acuática, supra.
A. Tipos de seguro
Entre los diferentes tipos de seguro se distinguen, por un lado, aquellos que van dirigidos a resguardar aspectos personales o pérdidas a la propiedad del propio asegurado, a diferencia de los seguros que le ofrecen protección frente a reclamaciones instadas en su contra por terceros que han sufrido daños por su causa. 9A Couch on Insurance 3d Sec. 129:1, págs. 129-5 a 129-6 (2005); 3 New Appleman on Insurance Law Library Edition Sec. 16.02[2], pág. 16-28 (Rel.5-9/2011). Esta última modalidad, conocida como seguro de responsabilidad civil o pública, “ ‘tien[e] como fin primordial “garantizar al asegurado contra la responsabilidad civil en que pueda incurrir ante terceros por actos de los que sea legalmente responsable’ ”. (Corchetes del original omitidos). Quiñones López v. Manzano Pozas, supra, pág. 153 (citando a J. Castelo Matrán, Diccionario Mapfre de Seguros, Madrid, Ed. Mapfre, 1988, pág. 264). Véase Meléndez Piñero v. Levitt & Sons ofP.R., supra. En otras palabras, el asegurador se compromete, conforme a las condiciones estipuladas en el contrato, a indemnizar a un tercero por aquellos daños y perjuicios que le ha causado el asegurado.
Evidentemente, un seguro no responde por toda gestión imaginable del asegurado que pueda causar daño a terceros. La cubierta se circunscribe a determinadas actividades específicamente delimitadas en la póliza conjuntamente con las exclusiones allí dispuestas, donde se exceptúan ciertas actividades por las que no viene obligado a indemnizar. Meléndez Piñero v. Levitt & Sons of P.R., supra.
Existen a su vez seguros que operan a diferentes niveles *901 para, de este modo, expandir el monto de la cobertura dis-ponible a un asegurado dependiendo de la magnitud del riesgo que se interesa proteger. Con este fin, se encuentran tanto la póliza en exceso como la póliza sombrilla. Ambas tienen como función cubrir riesgos que excedan la cubierta provista por las pólizas primarias.
El seguro primario provee una cubierta inicial y, como regla general, se activa tan pronto sobreviene una contin-gencia contemplada en la póliza. La póliza en exceso, por su parte, provee una cubierta sobre los límites de respon-sabilidad establecidos en el seguro primario. La obligación de pago no surge hasta que se hayan agotado los límites dispuestos en la póliza primaria correspondiente. Monteagudo Pérez v. E.L.A., supra; B.R. Ostrager y T.R. Newman, Handbook on Insurance Coverage Disputes, 10ma ed., Nueva York, Aspen Law & Business, 2000, see. 603[a], págs. 292-293.
De otra parte, el término póliza sombrilla se utiliza típicamente en el contexto de las pólizas de responsabilidad civil. En sus efectos resulta similar a la póliza en exceso, en tanto y en cuanto proporciona una cubierta adicional a la provista por la póliza primaria por aquellas pérdidas que excedan sus límites. 1 Appleman, supra, Sec. 1.06[7], pág. 1-61 (Rel.3 — 9/2010).
No obstante, su alcance es más amplio que el de una póliza en exceso en la medida en que, contrario a ésta, puede extenderse a riesgos no cubiertos por la póliza subyacente. Appleman, supra, Sec. 1.06[7], pág. 1-61 (2010); 3 Appleman Sec. 16.02[3][d][i], pág. 16-38 (2011); 4 Appleman Sec. 24.02[3], págs. 24-16.1 a 24-17 (2011); Os-trager, op. cit, Sec. 6.03[a], págs. 292-294.
El caso que nos ocupa gira en torno a una póliza tipo sombrilla emitida por Universal, la cual provee cubierta de hasta un millón de dólares ($1,000,000). No obstante, la obligación de pago de Universal se encuentra supeditada al límite de un millón de dólares ($1,000,000) provisto por el *902 seguro primario correspondiente a una póliza de responsa-bilidad general comprensiva emitida por IFC, declarada insolvente.
B. Ocurrencia (“occurrence”)
Con el propósito de determinar si la aseguradora tiene que responder por la reclamación objeto de este recurso, debemos examinar si los hechos, según decretados por el Tribunal de Primera Instancia y validados por el Tribunal de Apelaciones, se encuentran enmarcados en la cubierta provista por el contrato de seguro con Universal. De ser así, corresponde entonces verificar si la responsabilidad de Universal se halla a su vez suprimida por alguna de las exclusiones contenidas en la póliza mencionada.
La póliza de seguro tipo “Commercial Umbrella Liability Policy”, emitida por Universal, ofrece una cubierta por daños personales o a la propiedad de terceros, o sea, res-ponsabilidad civil, causados por una ocurrencia (“occurrence”). Este término([5]) se define en la póliza como “un accidente, incluyendo la exposición continua o repetida a condiciones que resultan en daños personales, daños a la propiedad ... no anticipados ni intencionales desde el punto de vista del asegurado” (Traducción y énfasis nuestros).
La expresión “ocurrencia” en el contexto de las pólizas comerciales de responsabilidad civil o pública surge a partir de 1966.([6]) Originalmente, esas pólizas típicamente proveían una cubierta por daños causados por “accidentes”. No obstante, ello presentaba problemas en la práctica puesto que el alcance del seguro resultaba extre- *903 madamente limitado al circunscribir su aplicación a un evento súbito o abrupto. Debido a las recurrentes disputas generadas sobre este particular, se reemplazó el término “accidente” por “ocurrencia”, modificando así su enfoque para extender, de este modo, la cubierta a situaciones de daños progresivos o continuos. 9A Couch on Insurance 3d Sec. 129:3, págs. 129-9 a 129-10 (2005); 3 New Appleman on Insurance Law Library Edition Sec. 16.02[3] [a] [iv], págs. 16-30 a 16-31 (2011).
A pesar de que el nuevo concepto “ocurrencia” ofrece una cubierta más amplia que la anteriormente provista por el término “accidente”, cabe señalar que, aun bajo la nueva perspectiva se requiere que la conducta que da origen a la reclamación sea “accidental”. 9A Couch on Insurance 3d Sec. 129:3, págs. 129-10 a 129-11 (12/05); 3 Appleman, See. 16.07[3][a], pág. 16-177.
Es por ello que, tal como sucede en la póliza ante nuestra consideración, la palabra “accidental” se hace constar taxativamente en la definición contemporánea de “ocurrencia”. Así pues, se ha indicado que el cambio en el enfoque “no elimina la necesidad de que tenga lugar un accidente”. (Traducción nuestra). A.D. Windt, Insurance Claims and Disputes, 5ta ed., St. Paul, Minn., Ed. Thompson/West, 2007, Sec. 11.3, pág. 11-31 (2007).
La expresión “accidente” ha de ser interpretada con-forme su significado común y ordinario. Para efectos de la definición de “ocurrencia”, ello denota un incidente o evento no planificado, no intencional, no anticipado, o imprevisto. Couch on Insurance 3d, supra, Sec. 129:3, pág. 129-11.
It has been said that an accident is merely an unanticipated event; it is that which occurs not as the result of natural routine, but as the culmination of forces working without design, coordination, or plan. In other words, damage that is the natural, ordinary, probable, or expected result of an insured’s action is not damage that was caused by an occurrence. (Notas al calce omitidas). Windt, op. cit., Sec. 11.3, págs. 11-32 a 11-33.
*904 Conforme a lo anterior, queda claro que la conducta de-liberada o intencional no constituye un “accidente” ni una “ocurrencia”. Windt, op. cit., pág. 11-43.
Para propósitos de determinar si, en efecto, el suceso que da margen a los daños constituye un accidente, es me-nester examinar el comportamiento que da base a la recla-mación desde el punto de vista del asegurado. Ello aparece consignado expresamente en la definición de “ocurrencia” que obra en la póliza transcrita anteriormente. Cónsono con lo anterior, hemos reconocido que “el concepto ocurren-cia (occurrence), no provee cubierta por actos culposos e intencionales del propio asegurado”. (Enfasis en el original). PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 D.P.R. 881, 904 (1994).
No obstante, cabe distinguir entre la conducta intencio-nal del asegurado y aquellos daños físicos o daños a la propiedad que no fueron anticipados por éste, ni tampoco tuvo la voluntad expresa de causarlos. Quiere esto decir que, independientemente de la voluntariedad atinente al comportamiento que trajo como consecuencia los daños, lo determinante es auscultar si esas secuelas eran igualmente deseadas por el asegurado. PFZ Props., Inc. v. Gen. Acc. Ins. Co., supra. Véase, además, Ostrager, op. cit., See. 8.03 [b], págs. 433-436.
Una mayoría de las jurisdicciones en Estados Unidos ha resuelto que la violación de contrato no constituye una ocurrencia.([7]) Esta norma responde a que con este tipo de póliza se persigue cubrir únicamente aquellos eventos que sean fortuitos e inesperados y no los resultados previstos de conducta deliberada del asegurado. Couch on Insurance, supra, Sec. 129:3, págs. 129-12 a 129-13. Una *905 póliza comercial de responsabilidad civil o pública está diseñada y pretende proveer una cubierta por responsabili-dad extracontractual por los daños ocasionados a terceras personas o a la propiedad de éstos. No cobija por responsa-bilidad contractual que únicamente ocasione daños econó-micos sin afectar a personas o propiedad ajena. Id., see. 129:3, pág. 129-13. Por ende, como regla general, aquellas reclamaciones basadas en la negligencia del asegurado se han considerado como comprendidas en el término ocurrencia. 7A Couch on Insurance 3d Sec. 103:19, pág. 103-46 (1997).
Coincidimos con esta apreciación sobre el alcance de la póliza emitida por Universal en este recurso. Arribamos a esta conclusión a base de la definición del término ocurren-cia allí consignado, conjuntamente con la naturaleza particular de la póliza de responsabilidad civil.
Nuestro dictamen se encuentra sustentado igualmente por el lenguaje de la póliza de Universal a los efectos de que la aseguradora se obliga a satisfacer aquellas sumas que el asegurado esté legalmente obligado a pagar por aquella responsabilidad impuesta por ley.([8]) Esta cláusula ha sido interpretada como que limita la cubierta única-mente a la esfera de daños extracontractuales y no a los daños resultantes por violación de contrato. Windt, op. cit., Sec. 11.7, pág. 1-136; López & Medina Corp. v. Marsh USA, Inc., 667 F.3d 58 (1er Cir. 2012).
“In consideration of the payment of the required premium, the Company hereby agrees, subject to all of the terms of this policy, to pay on behalf of the insured all sums, as more fully defined by the term ultimate net loss, for which the insured shall become obligated to pay by reason of liability.
“(a) imposed upon the insured by law ...”. (Énfasis nuestro y énfasis en el original omitido).
*906 IV
A. Negligencia — Artículos 1802 y 1803
La responsabilidad extracontractual se encuentra reglamentada por el Art. 1802 del Código Civil, 31 L.P.R.A. see. 5141 (Art. 1802), el cual dispone que “[e] 1 que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado”. Este precepto contempla las obligaciones que surgen como resultado de actos u omisiones propios. No cabe duda de que la responsabilidad civil impuesta por ese estatuto incluye, no solo las acciones culposas, sino igualmente las omisiones cuando existe un deber jurídico de actuar y de haberse realizado el acto omitido se hubiera evitado el daño. Hernández Vélez v. Televicentro, 168 D.P.R. 803 (2006).
De otra parte, a diferencia de la obligación de reparar daños por acciones u omisiones propios, el Art. 1803, 31 L.P.R.A. sec. 5142 (Artículo 1803),([9]) extiende ese deber reparador a los actos y las omisiones de otras personas por las que la ley exige que se debe responder. S.L.G. Vázquez-Ibáñez v. De Jesús, Vélez, 180 D.P.R. 387, 405 (2010). En otras palabras, el precepto impone responsabilidad por hechos ajenos motivados por diferentes tipos de relaciones como la de un patrono respecto de sus empleados. El estatuto igualmente establece una presunción de culpa por parte de las personas allí designadas. No *907 obstante, se admite la presentación de prueba en contrario para evitar, de este modo, la imposición de responsabilidad de naturaleza vicaria.
La causa de acción instaurada por el Art. 1803 consiste fundamentalmente en la culpa in vigilando o in eligiendo atribuible a las personas designadas estatutariamente como responsables. J. Santos Briz, La responsabilidad civil, 7ma ed., Madrid, Ed. Montecorvo, 1993, Vol. 1, pág. 483. Se establece, pues, una presunción de culpa que puede consistir en una falta de vigilancia “o en una desacertada elección (culpa in eligiendo)”. J. Castán Tobeñas, Derecho Civil español, común y foral, 15ta ed., Madrid, Ed. Reus, 1993, T. IV, pág. 973. “En general se dice que es una res-ponsabilidad fundada en la presunción iuris tantum de culpa propia, por la falta de vigilancia o de cuidado en la elección de las personas.” J. Puig Brutau, Fundamentos de Derecho Civil, 3era ed., Barcelona, Ed. Bosch, T. II, Vol. III, 1983, pág. 106.
B. Incumplimiento de obligación —Artículo 1057
En lo atinente a la relación contractual, una vez perfeccionado un contrato surge la obligación de cumplir con las debidas prestaciones, según pactadas por las partes so pena de responder por los daños ocasionados por tal inobservancia. A esos efectos, el Art. 1210 del Código Civil, 31 L.P.R.A. see. 3375, dispone:
Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresa-mente pactado, sino también a todas las consecuencias que según su naturaleza, sean conformes a la buena fe, al uso y a la ley.
“Culpa contractual, pues, es la que surge del incumpli-miento de las obligaciones que han convenido los contratantes. Éstos han establecido unas normas que se han obligado a cumplir, y de su incumplimiento, cuando es imputable a uno de ellos surge la culpa”. A. Borrell Macia, *908 Responsabilidades derivadas de culpa extracontractual civil, 2da ed., Barcelona, Ed. Bosch, 1958, pág. 75.
Conforme al mandato fijado en el Art. 1057 del Código Civil, 31 L.P.R.A. see. 3021,([10]) se le exige al deudor la debida diligencia en el desempeño de la obligación en todos sus aspectos. Así pues, para efectos de esta disposición:
[E]s fundamental la naturaleza de la obligación (propiamen-te, de la prestación), pues ésta es la que “exige” la diligencia debida .... El resultado es un trato totalmente riguroso para el deudor, el cual deberá emplear toda la diligencia necesaria y suficiente (sea ésta cual sea), para que la obligación quede definitivamente cumplida. La intensidad de la diligencia ... está presidida por la efectiva realización material del cumplimiento debido .... J.L. Lacruz Berdejo, Elementos de Derecho Civil, II Derecho de Obligaciones, 4ta ed., Madrid, Ed. Dykinson, Vol. I, 2007, pág. 169.
C. Diferencia entre violación contractual y extracontrac-tual
Las acciones ex delito surgen del incumplimiento de la regla cardinal en la que descansa la sana convivencia humana: no causar daño a los demás, o principio de alterum non laedere. Estas se encuentran preceptuadas en el Art. 1802, supra, y se distinguen porque la responsabilidad frente al perjudicado surge sin que le preceda una relación jurídica entre las partes concernidas. E.L.A. v. Soto Santiago, 131 D.P.R. 304, 313 (1992); Ramos v. Orientalist Rattan Furnt., Inc., 130 D.P.R. 712, 726 (1992). “[L]a responsabilidad civil entra en juego cuando una persona causa un daño ilícito a otra, con la que no está ligada por una relación jurídica previa”. (Escolio omitido). R. de Ángel *909 Yagüez, La responsabilidad civil, Bilbao, Universidad de Deusto, pág. 24.
De otra parte, las acciones ex contractus, mediante las cuales se reclaman daños derivados del incumplimiento de contratos y pautadas en el Art. 1054 del Código Civil, 31 L.P.R.A. sec. 3018,([11]) se refieren a actos u omisiones voluntarios que conllevan la inobservancia de obligaciones anteriormente acordadas. Según hemos indicado en otras ocasiones, estas reclamaciones tienen por objeto que se cumpla con las promesas contractuales sobre las cuales las partes prestaron su consentimiento. Trinidad v. Chade, 153 D.P.R. 280, 290 (2001); Ramos v. Orientalist Rattan Furnt., Inc., supra; Santiago Nieves v. A.C.A.A., 119 D.P.R. 711, 716 (1987). Se exige, por lo tanto, que al daño le preceda una relación jurídica entre las partes concernidas. Álvarez v. Rivera, 165 D.P.R. 1, 18 (2005); Trinidad v. Chade, supra; Ramos v. Orientalist Rattan Furnt., Inc., supra; Prieto v. Maryland Casualty Co., 98 D.P.R. 594, 619 (1970).
A tales efectos, el Tribunal Supremo de España ha expresado: “para que opere la responsabilidad contractual, con exclusión de la extracontractual o aquiliana, no basta que haya un contrato entre las partes, sino que se requiere la realización de un hecho dentro de la rigurosa órbita de lo pactado y como desarrollo del contenido negocial”. De Ángel Yagüez, op. cit, pág. 27.
Así pues, se resume la esencia de cada una de estas dos acciones de la manera siguiente:
... [Ú]nicamente procede la acción en daños contractuales (Art. 1054) cuando el daño sufrido exclusivamente surge como consecuencia del incumplimiento de una obligación específica- *910 mente pactada, daño que no ocurriría sin la existencia del contrato. Ahora bien, resolvemos que resulta procedente una reclamación de daños extracontractuales como resultado del quebrantamiento de un contrato, si el hecho causante del daño constituye una violación del deber general de no causar daño a otro, y, a la vez, incumplimiento contractual. (Énfasis nuestro y escolio omitido). Ramos v. Orientalist Rattan Furnt., Inc., supra, pág. 727.
No cabe duda, sin embargo, que una misma conducta puede dar origen a dos (2) tipos de causa de acción diferentes: una fundamentada en el concepto negligencia y la otra cimentada en las obligaciones contraídas mediante un acuerdo previo. Así lo reconocimos expresamente en Ramos v. Orientalist Rattan Furnt., Inc., supra, al validar la teoría de la concurrencia de acciones de resarcimiento derivadas de un contrato y, a la vez, de un acto ilícito extracontractual. Véase, además, Martínez Marrero v. González Droz, 180 D.P.R. 579, 592 (2011).
Para que opere deben coincidir los requisitos siguientes:
1. Que el hecho causante del daño sea al mismo tiempo in-cumplimiento de una obligación contractual y violación del de-ber general de no causar daño a otro, es decir, violación de un deber con abstracción de la obligación contractual que se daría aunque ésta no hubiere existido.
2. El perjudicado por efecto de la doble infracción (contractual y delictual) ha de ser la misma persona, es decir, el acree-dor contractual ....
3. Por último, es también necesario que la doble infracción haya sido cometida por una misma persona, el deudor contractual .... Ramos v. Orientalist Rattan Furnt., Inc., supra, pág. 725 (citando a Santos Briz, op. cit).
Nuestro Código Civil, trazando las disposiciones de su contraparte español, preceptúa los daños que conciernen a cada una de estas modalidades([12]), las cuales “responden a un principio común de derecho y a una finalidad *911 reparadora”. Ramos v. Orientalist Rattan Furnt., Inc., supra, pág. 722.
Queda claro, no obstante, que no procede la indemniza-ción conjunta por ambos tipos de acción, puesto que ello conllevaría una duplicidad de remedios. El resarcimiento procederá únicamente por una sola de las reclamaciones. Corresponde, por lo tanto, al perjudicado, optar por una de las dos (2) vías alternas para obtener la reparación satisfactoria a sus daños. Ramos v. Orientalist Rattan Furnt., Inc., supra.
D. Universal sostiene que la póliza sombrilla no pro-vee cubierta para los hechos presentes en este recurso por tratarse de una reclamación cimentada en un incumpli-miento de contrato. La aseguradora aduce que, contrario a la determinación recurrida, la demanda instada por Made-ras Tratadas y el señor Fernández meramente plantea el que CBI infringió las obligaciones contraídas mediante el acuerdo suscrito entre las partes, al no proveer servicios de seguridad apropiados. Es decir, al no haber escogido ni su-pervisado adecuadamente los guardias de seguridad asig-nados a velar por la seguridad de Maderas Tratadas, según pactado, lo cual ocasionó los daños exigidos mediante la presente acción judicial.
Para efectos de dilucidar esta controversia, los hechos que dan margen a la demanda instada por Maderas Trata-das y el señor Fernández son relativamente sencillos. Un empleado de CBI hurtó o permitió a otros sustraer propie-dad de Maderas Tratadas, mientras fungía como guardia de seguridad del lugar. Se estableció mediante juicio que la sustracción de mercancía se debió a la negligencia desple-gada por el patrono, en este caso la compañía de seguridad, al no implementar sistema alguno para evaluar y monito-rear a sus empleados. La pregunta obligada que surge en-tonces es si el deber de reparar ese daño surge única y exclusivamente como consecuencia de la relación contractual existente entre Maderas Tratadas y CBI o si existe al *912 mismo tiempo una obligación de indemnizar como parte de las normas habituales de respeto a los demás, indepen-diente de cualquier relación jurídica previa. Es decir, el deber general de no causar daño a otros implementado a través de las pautas de responsabilidad vicaria consigna-das en el Art. 1803.
Para poder responder al planteamiento de Universal de-bemos examinar en primera instancia las alegaciones con-tenidas en la demanda y, de este modo, indagar la natura-leza de las reclamaciones presentadas por Maderas Tratadas y el señor Fernández contra CBI. En el epígrafe de la demanda se identifica la materia de los asuntos allí presentados como “incumplimiento de contrato y daños y perjuicios”. En ella se le imputa a CBI tanto negligencia in eligiendo, así como in vigilando en relación a sus emplea-dos lo que, según se alega, trajo como consecuencia directa que se concretara el hurto. Igualmente, se mencionan los daños acaecidos como resultado de tal negligencia. Es de-cir, se delinearon los elementos básicos para una reclama-ción por daños y perjuicios a través del Art. 1803. Parale-lamente se hace mención del incumplimiento con las disposiciones contractuales del trabajo a ser llevado a cabo por la compañía de seguridad.
Conforme al Art. 1803, supra, se alude a la culpa in eligiendo, así como a la modalidad in vigilando como causa próxima de los daños. Igualmente, se consignó la contra-vención con las disposiciones contractuales al incumplirse con las normas atinentes al tipo de trabajo contratado. Po-demos concluir, por lo tanto, que desde los inicios del caso figuró la concurrencia de acciones. Se hizo mención de la identidad entre el causante del daño y el peijudicado. De otra parte, la conducta imputada dio margen al mismo tiempo a una acción por incumplimiento de una obligación contractual y a la violación del deber general de no causar daño a otro a través de la responsabilidad vicaria.
*913 A base de ello, quedaba a la discreción de la parte per-judicada escoger cuál de las dos vías indemnizatorias le resultaba más conveniente proseguir para vindicar sus derechos.
Una vez examinados los hechos, según la prueba que le mereció credibilidad, el Tribunal de Primera Instancia dic-taminó que la acción ejercitada por Maderas Tratadas y el señor Fernández estaba predicada esencialmente en los Arts. 1802 y 1803 del Código Civil, supra. Encontró que hubo negligencia por parte de CBI al no supervisar sus guardias de seguridad ni ejercer el debido cuidado al em-plearlos, por lo que, acorde con lo dispuesto en el Art. 1803, estaba obligado a responder por los daños sufridos por Ma-deras Tratadas y el señor Fernández.
El Tribunal de Apelaciones, por su parte, reconoció que la determinación apelada “declaró con lugar la demanda en daños y perjuicios” y como parte de su sentencia, analizó el derecho aplicable desde el punto de vista de los Arts. 1802 y 1803, supra. A esos efectos, decretó lo siguiente:
Realmente, la negligencia aquí estriba en escoger mal, en-trenar mal y no supervisar a guardias de seguridad que se contratan para precisamente hacer lo contrario a lo que aquí realizó el guardia Sr. Gonzalez. CBI incumplió, a su deber in eligiendo, Ortiz v. Scn. Serrallés, 89 DPR 419 (1963), como en su deber de supervisión y entrenamiento continuo, ante el riesgo latente de que el guardia de seguridad no actúe con-forme de él se espera. CBI es, precisamente una empresa de-dicada a prestar servicios de vigilancia a terceros. Además, tratándose de vigilancia nocturna y en días feriados, es previ-sible que si no se emplean medidas cautelares necesarias ocu-rra lo que sucedió. Martínez v. Chase Manhattan Bank, 108 D.P.R. 515 (1979). Sentencia del Tribunal de Apelaciones, págs. 16-17.
Al igual que el Tribunal de Primera Instancia, el Tribunal de Apelaciones dispuso que CBI respondía vicaria-mente al no tomar precauciones en el proceso de contratar sus guardias de seguridad y al permitirles llevar a cabo sus *914 funciones sin ningún tipo de control. Resolvió, por ende, que CBI era llamado a satisfacer los daños ocasionados por su empleado al robar o permitir el hurto de mercancía de aquél a quien venía obligado a proteger.
Evaluada las determinaciones del tribunal a quo no en-contramos razón de peso para interpretarlas de otro modo. Por tanto, para efectos de la póliza emitida por Universal en este recurso, la responsabilidad del asegurado frente a Maderas Tratadas y el señor Fernández se encuentra sus-tentada por los Arts. 1802 y 1803 del Código Civil, supra. Es decir, por los preceptos atinentes a la responsabilidad extracontractual.
Nuestro próximo paso se reduce a determinar si la ne-gligencia desplegada por CBI en este caso puede enmar-carse en la definición de ocurrencia de la póliza que exige conducta no intencional. Respondemos en la afirmativa.
Según mencionamos, Universal aduce que las alegacio-nes se reducen al incumplimiento de la obligación contractual asumida por CBI con Maderas Tratadas que de nin-guna manera pueden ser catalogadas como un accidente o una ocurrencia cubierta por la póliza. A estos efectos indica que no existe cubierta por no tratarse de una ocurrencia o un accidente con consecuencia hacia terceras personas.
No obstante, como ya explicáramos, en ningún momento concluyó el tribunal a quo que la reclamación probada constituía una violación de contrato. Tampoco aparece evi-dencia de que la omisión desplegada por CBI en relación al escogido y supervisión de sus empleados fuese una inten-cional o que CBI actuase con el propósito deliberado de causar daños a la propiedad de Maderas Tratadas. Cabe recordar que para efectos de este caso, conforme a la propia definición de ocurrencia, debemos examinar la conducta impugnada desde la perspectiva del asegurado, no de su empleado.
A base de lo expuesto, ciertamente podemos concluir que los hechos, según consignados por el tribunal juzgador, *915 caen en los parámetros de la definición de ocurrencia. Tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones hallaron a CBI negligente conforme a los Arts. 1802 y 1803, por no ejercer el cuidado debido al em-plear sus guardias de seguridad y al no supervisarlos adecuadamente. No estamos, por consiguiente, ante una determinación basada en violación de las obligaciones con-tractuales que surgieron como parte del contrato otorgado entre CBI y Maderas Tratadas. Tampoco aparece eviden-ciada una conducta intencional por parte del asegurado ac-tuando con el propósito deliberado de causar daño.
Por el contrario, no cabe duda de que en la situación planteada en este recurso se concretan los elementos nece-sarios para una reclamación en daños y peijuicios, que a su vez emanan de conducta que puede ciertamente catalo-garse como una ocurrencia.
V

Exclusiones

Una vez establecido que existe una cubierta para las reclamaciones interpuestas por Maderas Tratadas y el se-ñor Fernández, conforme a los parámetros de la póliza sombrilla de Universal, pasamos a considerar si, no obs-tante, aplica alguna de las disposiciones excluyentes allí provistas. Ello conlleva examinar con particular atención el lenguaje utilizado en las cláusulas pertinentes, habida cuenta de que las limitaciones de cubierta son general-mente desfavorecidas y han de ser interpretadas restricti-vamente contra el asegurador. Unicamente se exceptuarán aquellos riesgos que así aparezcan expresamente precep-tuados en el contrato de seguro.
Universal aduce que no proceden las reclamaciones in-terpuestas por Maderas Tratadas y el señor Fernández por encontrarse sujetas a las exclusiones atinentes a los ries-gos empresariales (business risks), así como a la correspon- *916 diente al “cuidado, custodia y control” de la propiedad que CBI vigilaba.
Pasamos entonces a evaluar ambas exclusiones indivi-dualmente con el propósito de auscultar su aplicación a los hechos, según delimitados en este recurso.
A. Riesgos empresariales (“business risks”)
Las pólizas comerciales de responsabilidad civil están diseñadas para proteger a los asegurados por pérdidas en sus gestiones de negocios. Normalmente se asocian dos (2) tipos de riesgos con los trámites comerciales: los de naturaleza torticera y los que surgen debido a que el negocio no cumple con sus obligaciones contractuales. Un ejemplo del primero lo constituye un producto defectuoso que causa daños a la propiedad o a individuos y, del segundo, lo sería el que no funciona conforme a las garantías contractuales provistas por el manufacturero. Con el propósito de eximir a las aseguradoras de la responsabilidad contractual correspondiente a pérdidas económicas cuando el producto de su asegurado no satisface las debidas garantías, se desarrolló la exclusión de los “riesgos empresariales”. R.C. Anzivino, The Economic Loss Doctrine: Distinguishing Economic Loss from Non-economic Loss, 91 Marq. L. Rev. 1081, 1112-1113 (Summer 2008). Véase, además, Windt, op. cit., Sec. 11:10, pág. 11-198.
Esta exclusión opera bajo la premisa de que el asegu-rado ejerce el control sobre la calidad de su trabajo y no debe permitirse que, a través de su conducta intencional o temeraria, controle los riesgos cubiertos por la póliza. Se considera que este tipo de riesgo constituye parte integral de la gestión de hacer negocios, por lo que su costo debe reflejarse en el precio del producto y no en la prima del seguro. 3 Appleman, supra, Sec. 18.03[10] [b], pág. 18-77.
Por lo tanto, cónsono con lo anterior, una póliza comer-cial de responsabilidad civil que contiene la mencionada exclusión está diseñada para proveer una cubierta por res- *917 ponsabilidad torticera por daños a terceros, pero no por daños contractuales debido a que el producto del asegu-rado no cumplió con lo pactado. Couch, supra, Sec. 129.16, pág. 129-36.
... In order to provide coverage for tort liability and exclude coverage for contract liability, a number of “business risk” exclusions are included within the standard commercial general liability policy. These exist for the express purpose of excluding coverage for risks that relate to the repair or replacement of the insured’s faulty work or products, or defects in the insured’s work or products themselves. These “business risk” exclusions are designed to provide coverage for tort liability only, and not for the contractual liability of the insured for economic losses that occur because the product or completed work was not what the other party bargained for.
A commercial general liability policy with its standard business risk exclusions provides insurers coverage for “property damage” that is tortious in nature, not contractual. ... (Esco-lios omitidos.) Anzivino, op. cit, págs. 1112-1113.
Como parte de sus exclusiones, la póliza de Universal dispone:
Section I of the Exclusions
This policy shall not apply:
C. to property damage to
(1) property owned by the insured,
(2) the insured’s products arising out of such products or any part of such products,
(3) work performed b[y] or on behalf of the insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished therewith;
(Enfasis en el original omitido y énfasis nuestro).
Las categorías reseñadas comprenden las tres (3) exclusiones que abarcan los “riesgos empresariales” comúnmente denominadas como: (1) “exclusión de daños a la propiedad” (injury to property exclusion)-, (2) “exclusión de daños al producto” (injury to products exclusion) y, por último, (3) “exclusión de daños al trabajo u obra realizada” *918 (Injury to work performed exclusion). Véase Meléndez Pinero v. Levitt & Sons of P.R., supra, pág. 542. Esas disposiciones corresponden, respectivamente, a daños ocasionados, ya sea a los bienes, productos o al trabajo u obra realizados por el asegurado.
Como requisito indispensable para que se active la alu-dida exclusión debe darse un daño a la propiedad. Las pri-meras dos (2) exclusiones conciernen a daños a la propie-dad acaecidos, ya sea a bienes del propio asegurado o a sus productos, por lo que no aplican a los hechos presentes en este caso. Por último, se exceptúan daños a la propiedad que padezcan la obra o la labor, realizados por el asegurado y los sobrevenidos como resultado, ya sea de su trabajo o como consecuencia de los materiales, partes o equipos pro-vistos en el desempeño de esa faena. Este último supuesto atiende situaciones en que el trabajo llevado a cabo por el asegurado resulta deficiente (faulty workmanship).
“De modo que cuando la obra o el producto del asegu-rado es defectuosa, el asegurador no responde por los da-ños que, precisamente, haya sufrido en sí misma la labor o bien del asegurado”. (Enfasis en el original). Meléndez Piñero v. Levitt & Sons of P.R., supra, pág. 539.
Cabe distinguir entre los defectos o vicios que sufra la obra realizada por el asegurado en sí, de los daños que pueda experimentar otro bien o propiedad como consecuencia de esos vicios. Meléndez Pinero v. Levitt & Sons of P.R., supra.
Ya tuvimos la oportunidad de interpretar esta cláusula en el contexto de alegaciones sobre deficiencias en un pro-yecto de construcción y concluimos que su lenguaje no re-sulta ni ambiguo ni oscuro. Por el contrario, resolvimos que la misma “claramente informa: la póliza no cubre ... los daños que padezca la obra realizada por el asegurado contratista como consecuencia de su trabajo”. (Citas y corchetes omitidos). Meléndez Piñero v. Levitt & Sons ofP.R., supra, pág. 541.
*919 Una vez evaluados los hechos relevantes a la controver-sia, encontramos que no resulta viable en este caso la apli-cación de la tercera modalidad de la exclusión atinente a los riesgos empresariales, puesto que la labor en controver-sia concierne únicamente a la prestación de un servicio. Es decir, no pueden ocasionarse daños a la labor o al trabajo realizados por CBI, según requiere la “Exclusión de daños al trabajo u obra realizada”, puesto que sus prestaciones estaban ceñidas únicamente a proteger la propiedad de Maderas Tratadas. No nos encontramos frente a una situa-ción en que el trabajo a cargo de CBI, que dio base a la reclamación, involucrase bienes tangibles como lo sería la construcción o manufactura de algún tipo de objeto fungible para poder concluir que, en efecto, se ocasionaron “da-ños al trabajo u obra realizada”, por el asegurado.
A base de lo anterior, es forzoso concluir que las recla-maciones de Maderas Tratadas y el señor Fernández no se encuentran exceptuadas como uno de los riesgos empresa-riales identificados en las exclusiones de la póliza de Universal.
B. Cuidado, custodia y control (“care, custody and control”)
Universal plantea, además, que, en este caso, las instalaciones de Maderas Tratadas se encontraban totalmente bajo la custodia y control de CBI cuando ocurrieron las apropiaciones ilegales. Aduce que, a base de ello, se activó la cláusula de exclusión de responsabilidad sobre daños a toda propiedad que se hallare bajo el “cuidado, custodia, control o posesión del asegurado” (care, custody or control exclusion). Esta disposición elimina la cubierta en aquellas situaciones en que el asegurado guarda un vínculo tal con la propiedad afectada que le permite ejercer cierto grado de control sobre ésta. PFZ Props., Inc. v. Gen. Acc. Inc. Co., supra. De este modo, se pretende evitar reclamos exagerados o falsos de su parte. Id.
*920 No obstante, hallamos que los casos citados por Universal en apoyo a su posición no aplican a la situación que nos concierne. A diferencia de la disposición que figura en la póliza de este recurso, la jurisprudencia aludida por Universal gira en torno a la exclusión de “propiedad” que obra bajo el cuidado, custodia o control del asegurado.([13])
La cláusula correspondiente a la póliza en este caso se limita a “dinero, valores, joyas u otros objetos de valor” que constasen bajo el cuidado, custodia o control de CBI.([14]) La exclusión se encuentra, por lo tanto, claramente circunscrita a ciertos bienes que denotan una naturaleza monetaria muy particular.
No cabe duda de que, ni el almacén custodiado por la asegurada, ni la parte del inventario sustraído de tales ins-talaciones puede ubicarse en las categorías enumeradas en la referida exclusión. La propiedad afectada concierne úni-camente a materiales de construcción y otras mercaderías que no implican de manera alguna los objetos de valor es-pecificados en la póliza.
Consiguientemente, tampoco aplica esta exclusión.
VI

Descenso de nivel (“drop down”)

Como próximo señalamiento, nos toca resolver si efectivamente la teoría de descenso de nivel (drop down), *921 ratificada por el Tribunal de Apelaciones, aplica a la póliza de Universal objeto de este recurso. La falta de capacidad económica de las aseguradoras para cumplir con sus obli-gaciones contractuales ha generado, a través de los años, un gran cúmulo de litigación concerniente a quién debe ser llamado a responder cuando una aseguradora primaria es declarada insolvente. Toca señalar que, en última instan-cia, la determinación de si debe o no obligarse a una ase-guradora en exceso a bajar de nivel descansa enteramente en los términos que figuran en la póliza. Las respuestas a esta interrogante han generado resultados totalmente va-riados e, incluso, incompatibles entre sí. Véase A.M. Sam-berg, Note, Drop Down Liability of Excess Insurers for Insolvent Primary Carriers: the Search for Uniformity in Judicial Interpretation of Excess Insurance Policies, 33 Ariz. L. Rev. 239 (1991).
Utilizando como base nuestra primera opinión en el caso de A.A.A. v. Librotex, Inc., 141 D.RR. 375 (1996), pos-teriormente revocada en reconsideración en A.A.A. v. Li-brotex, 142 D.P.R. 820 (1997) (.Librotex II), el tribunal pri-mario determinó que, no obstante su condición de sombrilla, la póliza emitida por Universal estaba obligada a asumir la posición del asegurador primario insolvente, de conformidad con la teoría de descenso de nivel (drop down). El Tribunal de Primera Instancia razonó que, de-bido a que la póliza en controversia no contenía endosos ni lenguaje indicando lo contrario, se creaba una expectativa de cubierta, por lo que se presumía que operaba el descenso.
El Tribunal de Apelaciones por su parte, aunque recono-ció que el enfoque del tribunal de instancia resultó errado, confirmó la determinación del tribunal a quo. Conforme a su sentencia, la aplicación de la norma aludida dependerá de: (1) que aparezca expresamente consignada la inclusión o la exclusión en la póliza o, en su defecto, (2) que ello se pueda inferir a base de la correlación entre la tarifa co-brada por el asegurador primario y la cobrada por el ase- *922 gurador sombrilla. Al no existir disposición expresa ati-nente al descenso, ese foro optó por utilizar este último criterio y concluyó que procedía el descenso a base del monto de la prima pagada a Universal.
En nuestra opinión, en el caso de Librotex II validamos el principio de que, “Homo regla general, una aseguradora que provee cubierta en exceso no viene compelida a cubrir a un asegurado en sustitución de una aseguradora primaria declarada insolvente”. (Énfasis suprimido). Librotex II, pág. 824. Esta norma responde a la naturaleza particular de las cubiertas en exceso, en conjunción con la expectativa a la que advienen los contratantes al momento de pactar el monto de la prima por tales cubiertas. La ex-pectativa de los contratantes en estas situaciones puede inferirse de la diferencia entre el monto de ambas primas, correlativo a los riesgos atinentes a cada tipo de póliza. Id.
Únicamente cuando el lenguaje plasmado en el contrato de seguro resulta ambiguo, toca a los tribunales examinar, caso a caso, las disposiciones de las pólizas de forma integral, con el propósito de discernir cuáles eran las expectativas de las partes al pactar la cubierta. Como es de esperar, este proceso estará sujeto a la regla interpretativa de que toda ambigüedad deberá ser resuelta a favor del asegurado. Librotex II.
A base de lo anterior nos corresponde, por lo tanto, resolver en primera instancia si los términos según vertidos en la póliza, resultan claros y obligan a las partes según redactados. O si, por el contrario, su imprecisión amerita que nos adentremos más allá para examinar si la parte asegurada confiaba razonablemente en que la póliza som-brilla ocuparía el lugar de la primaria, de declararse insolvente.
Entre los tres (3) tipos de lenguaje evaluados en nuestra opinión de Librotex II resolvimos que aquel que describe la cubierta como “en exceso de los límites de las pólizas des-critas en el propio contrato” se halla “claramente exent[o] *923 de toda ambigüedad” y, por lo tanto, no puede compelerse el descenso. Librotex II, pág. 827. Esta observación corres-ponde a la tercera categoría de cláusulas allí identificadas.
Los términos provistos en la póliza que nos ocupa se le asemejan y no encontramos base alguna para disponer un resultado contrario. Véase, además, Couch, supra, Vol. 1, Sec. 6:38, págs. 6-150 a 6-152. El monto de cubierta consig-nado en la póliza de Universal aparece claramente limitado al exceso que el asegurado tenga que pagar con relación a las pólizas primarias.([15])
De otra parte, la póliza sombrilla fija la responsabilidad de pago a “la pérdida total neta en exceso” de los límites correspondientes, según especificados en las pólizas primarias detalladas en el contrato. De ninguna manera se condiciona el pago de Universal a que sean o no cobrables las partidas primarias, lo que podría tornar los términos del contrato de seguro en ambiguos conforme aludimos en Li-brotex II.([16])
Igualmente se establece el límite de responsabilidad de la aseguradora, conforme a lo dispuesto en la póliza, inde-pendiente del número de asegurados, reclamaciones inter-puestas o de ocurrencias implicadas.([17])
Por último, como requisito para la cubierta se le exige al *924 asegurado que mantenga en vigor las pólizas primarias identificadas en la póliza. Se advierte que, en la eventua-lidad de que se incumpla con esta condición, la responsa-bilidad de la aseguradora continuará siendo igual a como si se hubiese dado el cumplimiento. ([18])
Conforme a las normas de interpretación aplicables a los contratos de seguro, evaluamos las disposiciones seña-ladas en su sentido común y de manera integral. Habida cuenta de que lo enunciado en el acuerdo entre las partes, atinente a la obligación de pago por parte de Universal en calidad de póliza sombrilla, se halla libre de ambigüedad, se hace innecesaria nuestra intervención adicional a los efectos de recoger la expectativa del asegurado. Por lo que, luego de examinar las disposiciones pertinentes de la pó-liza en cuestión, nos es forzoso concluir que, tal como ocu-rrió en Librotex II, las mismas resultan claras y no dan margen al descenso de Universal como póliza primaria.
Resolvemos, por lo tanto, que al Universal contratar con CBI quedó claramente apercibida de que estaba convi-niendo la compra de una póliza sombrilla que únicamente pagaría reclamaciones en exceso de la aseguradora prima-ria y no en su lugar.
Incidió, por lo tanto, el Tribunal de Apelaciones al con-firmar la determinación del tribunal juzgador a los efectos de que Universal venía obligada a responder en calidad de aseguradora primaria.
*925 VII

Temeridad

Por último, Universal impugna la determinación me-diante la cual se le ordenó conjuntamente con los otros demandados, es decir, Sun Alliance, la Asociación y CBI, al pago solidario de cincuenta mil dólares ($50,000) en cali-dad de honorarios de abogado, así como el pago de los in-tereses presentencia por su temeridad en el trámite de su defensa en el caso.
La facultad de imponer honorarios de abogado en casos en los que intervenga temeridad o frivolidad surge de la propia Regla 44.1 de Procedimiento Civil. ([19]) De otra parte, la Regla 44.3(b) de Procedimiento Civil([20]) provee para el pago del interés legal en aquellos procesos en los que medie tal comportamiento. Ya en ocasiones anteriores hemos resumido el concepto temeridad como aquella conducta que promueve un pleito que se pudo obviar, lo prolonga innecesariamente o que obliga a una parte a involucrarse en trámites evitables. Andamios de P.R. v. Newport Bonding, 179 D.P.R. 503, 519-520 (2010); Marrero Rosado v. Marrero Rosado, 178 D.P.R. 476, 504 (2010); Colón Santos v. Coop, de Seg. Mult. P.R., 173 D.P.R. 170, 188 (2008). Dicho de otro modo, se entiende que un litigante actúa con temeridad cuando “por su terquedad, obstinación, contu- *926 macia e insistencia en una actitud desprovista de funda-mentos, obliga a la otra parte, innecesariamente a asumir las molestias, gastos, trabajo e inconveniencias de un pleito”. Andamios de P.R. v. Newport Bonding, supra, pág. 520; S.L.G. Flores-Jiménez v. Colberg, 173 D.P.R. 843, 866 (2008).
La temeridad es improcedente en aquellos litigios que encierran planteamientos complejos y novedosos aun no resueltos en nuestra jurisdicción. Tampoco ha de emplearse cuando la parte concernida responde a lo que resulta ser una apreciación errónea del derecho sin que existan precedentes vinculantes al respecto o cuando existe alguna desavenencia honesta en cuanto a cuál de las partes beneficia el derecho aplicable. Santiago v. Sup. Grande, 166 D.P.R. 796, 821 (2006); Oliveras, Inc. v. Universal Ins. Co., 141 D.P.R. 900, 936 (1996).
Esta penalidad tiene como propósito disuadir la litiga-ción frívola, así como fomentar las transacciones, a través de sanciones que compensen a la parte victoriosa de los perjuicios económicos y las molestias ocasionadas por la temeridad desplegada por otra parte en el caso. Marrero Rosado v. Marrero Rosado, supra.
La evaluación de si ha mediado o no temeridad recae sobre la sana discreción del tribunal sentenciador y solo se intervendrá con ella en casos en que ese foro haya abusado de tal facultad. Marrero Rosado v. Marrero Rosado, supra; S.L.G. Flores-Jiménez v. Colberg, supra; Colón Santos v. Coop, de Seg. Mult. P.R., supra. Sin embargo, una vez fijada la existencia de temeridad, la imposición del pago de honorarios de abogado es mandatoria. Id.
Este planteamiento no amerita mayor discusión, ex-cepto acentuar la deferencia correspondiente que le debe-mos a las determinaciones de temeridad del tribunal a quo, forjadas en el amplio margen de discreción que le es dispensado. Dadas las circunstancias que rodean este liti-gio, no encontramos que el juzgador se haya excedido de *927 los lindes de tal atribución. El seguro provisto por Universal era extensivo a la negligencia vicaria imputada a CBI en la demanda instada por Maderas Tratadas, y posterior-mente probada durante el juicio, por constituir esa con-ducta una ocurrencia conforme el término se define en el contrato de seguro. De otra parte, las exclusiones aludidas por la aseguradora claramente no aplican en el contexto de este recurso.
VIII

CC-2006-0266

Luego de iniciado este recurso, Maderas Tratadas y el señor Fernández, conjuntamente con Sun Alliance, llega-ron a un acuerdo transaccional mediante el cual desistie-ron de sus reclamaciones mutuas, lo que dio por concluido en su totalidad el recurso CC-2006-0267. Aclararon, no obstante, que interesaban que el recurso CC-2006-0266 continuara su curso respecto a los planteamientos reseña-dos en tanto y en cuanto conciernen a CBI, la Asociación y Universal, todas partes ajenas al acuerdo.
A base de lo anterior, colegimos que quedan por resolver en este recurso CC-2006-0266 únicamente dos de las seis controversias inicialmente reseñadas por Maderas Trata-das y el señor Fernández en su alegato. Llegamos a esta conclusión habida cuenta de que en los primeros cuatro errores esbozados en su escrito, éstos cuestionaron exclusi-vamente la reducción efectuada por el Tribunal de Apela-ciones a ciertas partidas de pérdidas económicas acaecidas como consecuencia de “la negativa de [las o sus] asegura-doras de proveer la cubierta reclamada”. Resulta claro que estas impugnaciones iniciales solo competen a Sun Alliance, a base de su relación de aseguradora frente a Maderas Tratadas, no así a las demás aseguradoras con quienes Maderas Tratadas y el señor Fernández no guar-dan relación contractual alguna. Veamos.
*928 Como es sabido, las aseguradoras son llamadas a responder en exceso de su cubierta cuando anteponen sus intereses a los de su asegurado y fallan en sus deberes intrínsecos de representación, defensa o de transigir las reclamaciones por una cantidad razonable en los límites de cubierta. Véase, por ejemplo, Quiñones López v. Manzano Pozas, supra, págs. 174-175; Morales v. Automatic Vending Service, Inc., 103 D.P.R. 281 (1975). Sin embargo, en este caso, los principios aludidos no conciernen a la Asociación como tampoco a Universal. Ambas son aseguradoras de CBI y, por lo tanto, su deber fiduciario de proveer una representación y defensa adecuadas, además de aceptar transacciones razonables en los límites de sus pólizas, lo tienen únicamente en relación a su asegurado CBI y no frente a un tercero como lo son Maderas Tratadas y el señor Fernández en este caso.
Las razones para ello se han explicado de la manera siguiente:
The insurer’s contractual obligations and its common law duty of good faith and fair dealing are owed to the insured, not to the third party. The third party is not only a stranger to the relationship between insured and insurer but is a claimant whose claim is usually unliquidated and whose rights to payment of all or any amount on the claim are by the nature of things contestable. The third party is an adversary of the insured and of the insured’s liability carrier. As such, it simply cannot suffer any harm from the carrier’s handling of the claim. If the third party’s claim is not settled because the carrier breached a duty of good faith and fair dealing, the third party has suffered no loss as a result. It still has the right to reduce to judgment its claim against the insured. If the insured’s position against a claim has not been properly presented, the third party pursuing that claim has actually benefited as a result. D.J. Wall, Litigation and Prevention of Insurer Bad Faith, 2da ed., Colorado Springs, Shepard’s/McGraw-Hill, Inc., 1994, sec. 7.01, pág. 290. Véase, además, W.T. Barker y R.D. Kent, New Appleman Insurance Bad Faith Litigation, 2da ed., LexisNexis, 2010, Sec. 1.09[1], págs. 1-45 a 1-46.
Pasamos entonces a las controversias que nos concier- *929 nen como parte del recurso CC-2006-0266. La primera de ellas incide en el límite de la responsabilidad de la Asocia-ción por los daños reclamados como consecuencia de los sucesos que dieron base a este litigio. La segunda con-cierne a la reducción efectuada por el Tribunal de Apela-ciones sobre la partida de costas originalmente concedida por el Tribunal de Primera Instancia a Maderas Tratadas y el señor Fernández por los gastos relacionados con el Sr. Richard Bell (señor Bell), uno de sus peritos.
IX

Asociación de garantías misceláneas

Maderas Tratadas cuestiona la reducción de la respon-sabilidad de la Asociación en este caso al máximo de ciento cincuenta mil dólares ($150,000) efectuada por el tribunal apelativo intermedio. Insiste en que la Asociación venía obligada a responder por cada uno de los diecisiete avisos de reclamación sometidos por ésta hasta el máximo de un millón de dólares ($1,000,000) de la póliza emitida por ICF.
Mediante la Ley 72, supra, se creó la Asociación y como parte de sus objetivos, el estatuto delegó en esa entidad la responsabilidad de establecer un mecanismo para sufragar reclamaciones atinentes a aseguradoras declaradas insolventes. Art. 38.020 (26 L.P.R.A. sec. 3802). El fondo disponible a la Asociación para cumplir con estos fines se nutre de derramas impuestas a las propias aseguradoras. íd.
La Ley 72, supra, prescribe que sus disposiciones deberán ser interpretadas “liberalmente” con el fin de alcanzar los propósitos para los cuales fue diseñada. Art. 38.040 (26 L.P.R.A. sec. 3804).
Se define como reclamante “todo asegurado que pre-sente una reclamación como reclamante o toda persona *930 que radique una reclamación por responsabilidad civil”. Art. 38.050(3), 26 L.P.R.A. sec. 3805(3). De otra parte, de-creta la mencionada ley que reclamación cubierta significa “una reclamación no pagada ... que surja de, y esté dentro de la cubierta y esté sujeta a los límites aplicables de una póliza de seguro”. Art. 38.050(6), 26 L.P.R.A. sec. 3805(6).
Lo dispuesto en la Ley 72, supra, aplicable a los hechos de este recurso/[21]) disponía para un pago máximo de ciento cincuenta mil dólares ($150,000) “por reclamación”. Art. 38.080(a)(1), 26 L.P.R.A. sec. 3808(a)(1)). Advertía, no obs-tante, que en ningún caso se habría de pagar una cantidad que sobrepasase el “exceso de la obligación del asegurador insolvente bajo la póliza o cubierta de la cual surge la reclamación”. íd. Es decir, se mantenía como límite alterno el establecido en la póliza por la cual estaba compareciendo la Asociación en la eventualidad de que fuese menor de ciento cincuenta mil dólares ($150,000),([22]) por lo que la obligación de pago se circunscribía a la menor de estas dos cuantías.
En Montañez v. U.P.R., 156 D.P.R. 395 (2002), resolvi-mos que, conforme al derecho vigente en aquel entonces, la cantidad máxima que venía obligada a pagar la Asociación al sustituir una aseguradora insolvente, se calculaba a base de cada reclamación interpuesta y no fundamentado en cada accidente u ocurrencia. Explicamos que, bajo el concepto accidente u ocurrencia, la responsabilidad del asegurador se fija en una cantidad máxima por cada evento independientemente del número de reclamaciones o causas de acción que surjan como resultado de éste. Al es- *931 tatuto prescribir un límite “por reclamación”, sin embargo, se refiere “a cada condena de daños independientemente (each judgment) por la cual el asegurado resulte responsa-ble como consecuencia de un accidente; es decir, cada causa de acción independiente”. Montañez v. U.P.R., supra, pág. 416.
Como único fundamento a su argumento sobre este particular, Maderas Tratadas indica que, habida cuenta de que sometió un total de diecisiete reclamaciones ante la Asociación por los hurtos perpetrados en sus instalaciones, le corresponde el pago de ciento cincuenta mil dólares ($150,000) por cada una, según dictaminó el foro primario.([23]) Ello limitado, por supuesto, hasta el máximo de un millón de dólares ($1,000,000) provisto en la póliza de ICF. No obstante, aparte del número de reclamaciones sometidas, Maderas Tratadas no añade explicación alguna para justificar su derecho al pago de las cantidades requeridas.
Por otro lado, la Asociación aduce que no existe eviden-cia en los autos que sustente el número de reclamaciones pretendidas. Argumenta que el hecho de que se le sometie-ran diecisiete formularios de reclamaciones no es sinónimo de que, en efecto, ocurriesen diecisiete eventos individua-les de sustracción de mercancía como se pretende.
Debemos revisar, por ende, si la evidencia sometida en este caso es suficiente para sustentar la determinación del tribunal de instancia como aduce Maderas Tratadas. Se-gún explicamos en Montañez v. U.P.R., supra, pág. 416, cada reclamación contemplada en la Ley 72, supra, debe corresponder “a cada causa de acción independiente”. Por consiguiente, la controversia se reduce a verificar si existe en los autos prueba de diecisiete causas de acción separa- *932 das que, a la vez, sustenten cada una de las reclamaciones sometidas por Maderas Tratadas.
Es innegable que se desconoce a ciencia cierta en qué días específicos ocurrieron los hechos que dan lugar a las reclamaciones sometidas a la Asociación, ni la pérdida co-rrespondiente a cada una de ellas. Conforme a los autos, lo único que quedó establecido durante el juicio fue: (1) el total del inventario sustraído a causa de hurto y (2) que esto ocurrió en el transcurso aproximado de un (1) año, es decir, entre 1991 y 1992. Lo que nos lleva a concluir que, a pesar de que se hayan podido establecer daños en exceso de dos millones de dólares ($2,000,000) a base de la pér-dida de inventario, no por ello se dan por acreditadas die-cisiete causas de acción separadas.
A esos efectos notamos que, al menos cuatro de las cinco querellas sometidas ante la Policía de Puerto Rico que obran en autos, no son contemporáneas con los hurtos alegados. Tampoco se pormenorizan la fecha ni el valor de la mercancía hurtada en esas ocasiones. Por ejemplo, el 10 de diciembre de 1992 se presentaron simultáneamente cuatro querellas referentes a sucesos acaecidos en fechas tan lejanas como jimio del año anterior. En cada una de ellas se identifica únicamente el mes en que alegadamente sucedieron los hechos sin precisar un día en particular.([24]) Igualmente, se valora la mercancía hurtada meramente en “más de $200.00 dólares”.([25])
De otra parte, advertimos que el testimonio del señor Fernández sobre este particular resulta totalmente vago e impreciso. Durante el juicio no pudo establecer las fechas cuando ocurrieron los eventos, a la vez que reconoció que no existía base alguna para optar por un número concreto de reclamaciones. Conforme a la “Exposición Narrativa Es- *933 tipulada de la Prueba Oral” sometida por las partes, indicó lo siguiente:
[S]obre los hurtos que se reclamaron ante el Comisionado de Seguros por [Maderas Tratadas], el señor Fernández declaró que se colocó ese número (17 formularios) como pudo haberse colocado cualquier otro. Según él, lo importante era que había sido más de uno y no el número exacto de hurtos. Asimismo, el señor Fernández en su testimonio no pudo identificar y/o des-cribir la ocurrencia o perpetración de los (17) hurtos en dife-rentes fechas.
A base de lo anterior, nos es forzoso concluir que el nú-mero de hurtos, las fechas cuando éstos sucedieron y el monto de las pérdidas correspondientes a cada uno de es-tos eventos son desconocidos. Aun interpretando las dispo-siciones estatutarias liberalmente a favor de la parte recla-mante para lograr que se beneficie de sus disposiciones, no podemos llegar a otro resultado. Adentrarse a precisar la cantidad específica de incidentes, así como el valor de la mercancía hurtada en cada ocasión para traducirlos en causas de acción separadas, resulta imposible con la escasa información disponible. Por lo tanto, el total de reclamacio-nes sometidas por Maderas Tratadas es completamente especulativo. Tal como indicó el señor Fernández durante el juicio, se pudo haber seleccionado cualquier número de incidentes al azar.
Actuó, por lo tanto, correctamente el Tribunal de Apela-ciones al resolver que, en este caso, la Asociación respondía únicamente por la cantidad de ciento cincuenta mil dólares ($150,000).
X

Costas; perito Sr. Richard Bell

Maderas Tratadas está igualmente en desacuerdo con la reducción efectuada por el Tribunal de Apelaciones a los honorarios concedidos por los gastos correspondientes a uno de sus peritos.
*934 En nuestro ordenamiento, la concesión de costas se rige por lo provisto en la Regla 44.1(a) de Procedimiento Civil (Regla 44.1(a)).([26]) A través de ese precepto, se pretende resarcir a la parte que advenga victoriosa en el caso mediante el reembolso de aquellos gastos que se estimen necesarios y razonables para efectos de prevalecer en su posición. J.T.P. Dev. Corp. v. Majestic Realty Corp., 130 D.P.R. 456, 460 (1992); Rodríguez Cancel v. A.E.E., 116 D.P.R. 443, 461 (1985); Ferrer Delgado v. Tribunal Superior, 101 D.P.R. 516, 517 (1973).
En este sentido, supone una función reparadora puesto que, según expresáramos anteriormente, su derecho “no debe quedar menguado por los gastos que tuvo que incurrir sin su culpa y por culpa del adversario”. J.T.P. Dev. Corp. v. Majestic Realty Corp., supra, pág. 460. Véase Garriga, Jr. v. Tribunal Superior, 88 D.P.R. 245, 253 (1963). Esta premisa cobra mayor relevancia en la actualidad, habida cuenta del aumento desmedido en la partida de gastos relacionados a los trámites judiciales.
Cabe notar que, una vez reclamadas por la parte preva-leciente, la imposición de costas a beneficio de la parte pre-valeciente resulta mandatoria. J.T.P. Dev. Corp. v. Majestic Realty Corp., supra; Garriga, Jr. v. Tribunal Superior, supra, pág. 248.
Por lo dispuesto en la propia regla, no todos los gastos del litigio son recobrables. J.T.P. Dev. Corp. v. Majestic *935 Realty Corp., supra; Andino Nieves v. A.A.A., 123 D.P.R. 712, 716 (1989); Garriga, Jr. v. Tribunal Superior, supra. “[L]as costas procesales no cubren la totalidad de los gas-tos que ocasiona el proceso; ya que no son sinónimos de los gastos del litigio y tienen una interpretación restrictiva que se justifica tradicionalmente en el interés de garanti-zar el mayor acceso a los litigantes de manera económica”. J.A. Cuevas Segarra, Tratado de derecho procesal civil, 2da ed., San Juan, Pubs. J.T.S., 2011, T. IV, pág. 1266.
Quedan sujetos a las disposiciones del mencionado pre-cepto procesal únicamente aquellos expendios que se con-sideren necesarios en la gestión judicial. Igualmente co-rresponde al tribunal, en el marco de su discreción, evaluar la razonabilidad de éstos. J.T.P. Dev. Corp. v. Majestic Realty Corp., supra.
Aunque hemos reconocido que los gastos de un perito están comprendidos en el concepto de costas recobrables, advertimos que, en el caso particular de los expertos contratados por las partes, el rembolso opera por vía de excepción y se concederán únicamente cuando ello esté plenamente justificado. Andino Nieves v. A.A.A., supra; Toppel v. Toppel, 114 D.P.R. 16, 22 (1983); Meléndez v. Levitt & Sons of RR., 104 D.P.R. 797, 811 (1976).
Relativo al caso de honorarios de peritos, su compensación, como gastos, no es automática; el tribunal al pasar juicio sobre si procede o no el pago de dichos honorarios, tendrá que eva-luar su naturaleza y utilidad a la luz de los hechos particula-res del caso ante su consideración, teniendo la parte que los reclama el deber de demostrar que el testimonio pericial pre-sentado era necesario para que prevaleciera su teoría. Rodríguez Cancel v. A.E.E., supra, pág. 461; Toppel v. Toppel, supra.
Así pues, lejos de ser automática, la designación de la compensación de un perito como costas está sujeta a los rigores del escrutinio judicial a través del cual se exami-nará tanto la naturaleza de su preparación, como la utili- *936 dad de su intervención. Significa esto que, deben tomarse en cuenta las credenciales que ostenta el experto desig-nado para rendir una opinión sobre una materia en particular. También corresponde examinar el alcance de su testimonio, para de este modo estar en posición de aquila-tar su utilidad en beneficio de la postura procesal de la parte que resulte victoriosa. Cónsono con lo anterior, se descartará en la medida en que éste resulte “irrelevante, inmaterial o innecesario” en la tramitación del caso del que solicita el rembolso. Toppel v. Toppel, supra, pág. 22; Melendez v. Levitt & Sons of P.R., supra, pág. 811.
El Tribunal de Apelaciones redujo a la mitad([27]) la par-tida de costas relativa a los gastos incurridos por Maderas Tratadas en la contratación del señor Bell, uno de sus pe-ritos, por entender que no todo su trabajo y testimonio ha-bía sido de utilidad en el litigio.
Para la fecha del juicio, el señor Bell, con una prepara-ción de CPA, se dedicaba a trabajos de consultoría indepen-diente en las áreas de análisis y consultoría financiera. Fue contratado por Maderas Tratadas en 1995, luego de descubrirse los robos acaecidos durante el año fiscal 1991-1992. Su encomienda era dual. Debía revisar la cuantifica-ción de pérdida efectuada por la firma Semprit & Nieves,![28]) auditores externos de la empresa desde 1991, además de analizar las críticas a esos trabajos, según con-signadas por el Sr. Roberto Quintana (señor Quintana), el CPA contratado por Sun Alliance como su perito en el caso.
El Sr. Abimael Semprit Cruz, CPA (señor Semprit) tam-bién compareció como perito de Maderas Tratadas en el juicio. Su testimonio consistió en establecer que la causa *937 de la pérdida de inventario se debió al hurto perpetrado en la compañía, así como cuantificar esas pérdidas.
Luego de examinar los segmentos relevantes de la Ex-posición Narrativa Estipulada de la Prueba Oral sometida por las partes y a la luz de los principios mencionados, coincidimos con la apreciación del tribunal apelativo inter-medio sobre la utilidad y el alcance limitados del testimo-nio del perito, señor Bell. Su labor estuvo centrada en el cotejo de los trabajos del señor Semprit y el señor Quintana. Según acertadamente lo sintetizó el Tribunal de Apelaciones, su papel se circunscribió a robustecer la posi-ción de Maderas Tratadas en el litigio.
De otra parte, la intervención del señor Semprit se cali-ficó como indispensable y necesaria para la resolución del caso a favor de Maderas Tratadas y sus honorarios fueron adjudicados íntegramente como costas.
A base de lo anterior, entendemos que no erró el Tribunal de Apelaciones al reducir en un cincuenta porciento (50%) los honorarios del señor Bell en este caso.
XI
Por lo expuesto, modificamos la sentencia del Tribunal de Apelaciones a los únicos efectos de decretar que no pro-cede el descenso de nivel de la póliza de Universal, por lo que ésta no asumirá las partidas impuestas a ICF y, así modificada, se confirma.

Se dictará sentencia de conformidad.

El Juez Presidente Señor Hernández Denton se inhibió. La Juez Asociada Señora Rodríguez Rodríguez no intervino.

(1) Maderas Tratadas y Luis J. Fernández expusieron de manera conjunta los argumentos atinentes a tres (3) recursos relacionados mediante el alegato de los recurridos Maderas Tratadas, Inc. y Luis J. Fernández, y la réplica al alegato de la recurrida Sun Alliance, sometido el 19 de septiembre de 2006, aunque, por error, citó el caso ante nos como CC-2006-0229, en lugar de CC-2006-0228. Los otros dos (2) recursos son: Maderas Tratadas, Inc. et al. v. Sun Alliance Insurance Company et al., CC-2006-0266 y Maderas Tratadas, Inc. et al. v. Sun Alliance Insurance Company et al., CC-2006-0267. El escrito se unió al recurso CC-2006-0266. Aun cuando ordena-mos la consolidación de los recursos CC-2006-0266 y CC-2006-267 el 19 de mayo de 2006, denegamos la solicitud de consolidación en el recurso CC-2006-0228 mediante resolución de 20 de diciembre de 2006. No obstante, el 13 de septiembre de 2011, Maderas Tratadas y Luis J. Fernández Díaz solicitaron el desistimiento del recurso CC-2006-0267 instado contra Sun Alliance Company, así como de las reclamaciones contra esa aseguradora, según vertidas en el CC-2006-0266. Mediante una resolu-ción emitida el 10 de mayo de 2012 accedimos a lo solicitado y anulamos el auto de certiorari previamente expedido en el recurso CC-2006-0267. Además, hoy dejamos sin efecto nuestra denegatoria objeto de la Resolución de 20 de diciembre de 2006 y concedemos la consolidación del recurso CC-2006-0266 con el CC-2006-0228.

(2) Conforme a la evidencia creíble al juzgador, el guardia González no solo permitió la entrada de individuos al lugar para sustraer mercancía, sino que llegó a dar acceso a un furgón tipo “Sea Land” de aproximadamente cuarenta (40) a cin-cuenta (50) pies de largo para adelantar tales propósitos.

(3) El término aparece definido de la forma siguiente en el Art. 1 del Código de Seguros:
“Seguro — Es el contrato mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo. ...”. 26 L.P.R.A. see. 102.

(4) Se entiende por contrato de adhesión aquel en que una de las partes dicta las condiciones atinentes al contrato, viniendo la otra parte obligada a aceptarlas por no contar con potestad alguna para variarlas. S.L.G. Francis-Acevedo v. SIMED, 176 D.P.R. 372, 386 (2009); López v. Atlantic Southern Ins. Co., 158 D.P.R. 562, 568 esc. 2 (2003); Quiñones López v. Manzano Pozas, 141 D.P.R. 139, 155 esc. 17 (1996).

(5) La póliza, redactada en inglés, define “occurrence” de la manera siguiente: “an accident, including continuous or repeated exposure to conditions, which results in personal injury, property damage ... neither expected nor intended from the standpoint of the insured”. (Énfasis en el original).

(6) Estos términos corresponden a pólizas modelo desarrolladas por la industria de seguros de Estados Unidos a través de una organización denominada “Insurance Services Office” con el propósito de uniformar las condiciones de cubierta ofrecidas a través de sus productos. Véase 3 New Appleman on Insurance Law Library Edition Sec. 16.02[3][a][iii] pág. 16-29 (2011).

(7) Reconocimos anteriormente la utilidad y el valor persuasivo de la interpre-tación conferida por la jurisprudencia federal y estatal de Estados Unidos a las pólizas modelo mercadeadas en Puerto Rico. Molina v. Plaza Acuática, 166 D.P.R. 260, 266 (2005); Guarido García v. U.C.B., 143 D.P.R. 337, 346-347 (1997); Meléndez Pinero v. Levitt & Sons of P.R., 129 D.P.R. 521, 535 (1991).

(8) La póliza emitida por Universal en este caso dispone lo siguiente, en su parte pertinente:

(9) El Art. 1803 provee, en lo pertinente, lo siguiente:
“La obligación que impone [el Artículo 1802] es exigible, no sólo por los actos u omisiones propios, sino por los de aquellas personas de quienes se debe responder.
“Lo son igualmente los dueños o directores de un establecimiento o empresa respecto de los pequieios causados por sus dependientes en el servicio de los ramos en que los tuvieran empleados, o con ocasión de sus funciones.
“La responsabilidad de que trata esta sección cesará cuando las personas en ella mencionadas prueben que emplearon toda la diligencia de un buen padre de familia para prevenir el daño”.

(10) El Art. 1057 dispone como sigue:
“La culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar.
“Cuando la obligación no exprese la diligencia que ha de prestarse en su cum-plimiento, se exigirá la que correspondería a un buen padre de familia”.

(11) El Art. 1054 dispone lo siguiente:
“Quedan sujetos a la indemnización de los daños y peijuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas”. 31 L.P.R.A. see. 3018.

(12) Véase el Art. 1802, supra, atinente a los daños causados por negligencia, y el Art. 1054, supra, que dispone para daños por el incumplimiento de las obligaciones contractuales.

(13) Así pues, en Stewart Warner Corp. v. Burns Int’l Sec. Sera, Inc., 527 F.2d 1025, 1027 (7mo Cir. 1975), la cláusula de exclusión se circunscribió a daños atinentes a “property in the care, custody or control of the insured”. (Énfasis nuestro). En Employers Mut. Cas. Co. v. Trinity Universal Ins. Co., 376 S.W.2d 766, 767 (1964), se exceptuó de cubierta “property rented to or in charge of the insured”. (Énfasis nuestro). Igualmente, en Rogers v. British and Overseas Ins. Co., Ltd., 204 N.Y.S. 2d 42, 43 (1960), la póliza excluyó los daños siguientes: “[to] property used by or in the care, custody or control of the insured”. (Énfasis nuestro).

(14) El endoso Núm. 5 de la póliza emitida por Universal dispone:
“CARE, CUSTODY OR CONTROL EXCLUSION “IT IS AGREED THAT THE COVERAGES AFFORDED BY THIS INSURANCE SHALL NOT APPLY TO MONEY, SECURITIES, JEWELRY OR OTHER VALUABLES IN THE CARE, CUSTODY OR CONTROL OF THE INSURED OR ENTRUSTED TO THE INSURED FOR SAFEKEEPING”. (Énfasis nuestro).

(15) Contrasta esa cláusula con aquella que establece que al computar la suma que se ha de pagar en calidad de exceso debe tomarse en consideración “cualquier otra cubierta cobrable por el asegurado” lo cual puede interpretarse como que da paso al descenso de nivel. Librotex II, pág. 828.

(16) La cubierta aparece descrita de la manera siguiente:
“2. UNDERLYING LIMIT — RETAINED LIMIT
“The Company shall be liable only for the ultimate net loss [of] the excess of the greater of the insured’s underlying limit or retained limit definetd] as:
“(a) Underlying limit — an amount equal to the limits of liability indicated beside the underlying insurance listed in the schedule of underlying insurance, plus the applicable limits ...”. (Énfasis nuestro).

(17) A esos efectos, el contrato de seguro provee:
“3. LIMITS OF LIABILITY
“Regardless of the number of persons and organizations who are insured under this policy and regardless of the number of claims made and suits brought against any or all insured, the total limit of the Company’s liability for the ultimate net loss resulting from any one occurrence shall not exceed the amount specified in Item 4(a) of the declarations”.

(18) La cláusula pertinente dispone como sigue:
“CONDITIONS
“MAINTENANCE OF UNDERLYING INSURANCE
“The policy or policies referred to in the attached Schedule of underlying insurance ... shall be maintained in full effect during the currency of this policy .... Failure of the insured to comply with the foregoing shall not invalidate this policy but in the event of such failure, the Company shall only be liable to the same extent as if the insured had complied with this condition”. (Enfasis nuestro).

(19) Debido a que la imposición de honorarios se hizo al amparo de las Reglas de Procedimiento Civil de 1979, las utilizaremos en nuestro análisis.
La Regla 44.1(d) de Procedimiento Civil de 1979, 32 L.P.R.A. Ap. Ill (ed. 2001), establece lo siguiente:
“En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspon-dan a tal conducta”.

(20) La Regla 44.3(b) de Procedimiento Civil de 1979, 32 L.P.R.A. Ap. Ill (ed. 2001), dispone lo siguiente en su parte pertinente:
“El tribunal también impondrá a la parte que haya procedido con temeridad el pago de interés ... desde la radicación de la demanda, en caso de daños y peijuicios, y hasta la fecha en que se dicte sentencia ...”.

(21) La cuantía pagadera por la Asociación así como la metodología para el cál-culo del pago correspondiente sufrieron cambios sustanciales en el 2008. En virtud del Art. 1 de la Ley 262-2008 (26 L.P.R.A. sec. 3808(a)(2)), se aumentó el monto pagadero a trescientos mil dólares ($300,000) “por evento independientemente del número de reclamantes [y a un máximo] de un millón de dólares ($1,000,000.00) como agregado anual, independientemente del número de eventos cubiertos bajo esa póliza”.

(22) Esta disposición igualmente preservó como tope el límite de la póliza del asegurador insolvente.

(23) Ello equivaldría a un total de dos millones quinientos cincuenta mil dólares ($2,550,000).

(24) Se indica, por ejemplo, “junio 1991 día”, “nov. 1991 noche”, “die. 91 noche” y “junio 92 noche”.

(25) La quinta querella, correspondiente al 29 de junio de 1992, reporta un es-calamiento acaecido durante el fin de semana de 27 al 28 de junio del mismo año, pero nota que el valor de la mercancía hurtada es “desconocido”.

(26) Utilizamos las disposiciones procesales atinentes a las Reglas de Procedi-miento Civil de 1979 porque fue bajo ellas que se concedieron las costas. Notamos, no obstante, que la versión de este inciso en particular correspondiente a las enmiendas de 2009 no conllevó cambios sustanciales.
La Regla 44.1(a) de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. Ill (ed. 2001)), establece lo siguiente:
“Las costas le serán concedidas a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación, excepto en aquellos casos en que se dispusiera lo con-trario por ley o por estas reglas. Las costas que podrá conceder el tribunal son los gastos incurridos necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que un litigante debe rem-bolsar a otro”.

(27) Como resultado, dicha cantidad se vio reducida de cincuenta y ocho mil treinta y seis dólares con setenta y nueve centavos ($58,036.79) a veintinueve mil dieciocho dólares con cuarenta centavos ($29,018.40).

(28) para ¡a fecha del juicio, la firma se denominaba Howath Vélez Semprit & Co.